# Expiration of Authorizations of Appropriations for Social Security Administration Grant Programs

Notwithstanding the expiration of the specific authorizations of appropriations for the Work Incentives Planning and Assistance program and the Protection and Advocacy for Beneficiaries of Social Security program, the appropriation for administrative expenses of the Social Security Administration remains available to fund those two grant programs. When an agency has legal authority to administer a program and appropriated funds are available for that purpose, the absence or expiration of an authorization of appropriations does not prevent the agency from expending funds on the program unless such a restriction is imposed by statute.

February 4, 2013

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
SOCIAL SECURITY ADMINISTRATION

Work Incentives Planning and Assistance ("WIPA") and Protection and Advocacy for Beneficiaries of Social Security ("PABSS") are grant programs administered by the Social Security Administration ("SSA") under sections 1149 and 1150 of the Social Security Act, 42 U.S.C. §§ 1320b-20, 1320b-21. These sections provide the SSA with permanent statutory authority to conduct both programs, as well as directions that the programs be funded out of the SSA's annual appropriations for administrative expenses. They also contain provisions authorizing appropriations specifically for such programs only through fiscal year 2011. Citing the expiration of these authorizations of appropriations, the SSA concluded that it could not spend any funds from its 2012 appropriation on the programs and so informed Congress. The Government Accountability Office ("GAO") reached the contrary conclusion, explaining that the "SSA ha[d] adequate authority to continue both programs" "[b]ecause the program authority in the enabling statutes has not expired, and SSA has an appropriation that is available to cover the costs of these programs." *Social Security Administration—Work Incentives Planning and Assistance Program (WIPA) and Protection and Advocacy for Beneficiaries of Social Security Program (PABSS)*, B-323433, at 6 (Aug. 14, 2012) ("GAO Opinion"), http://www.gao.gov/assets/600/593739.pdf.

In light of the conflict between the positions of the SSA and the GAO, you have asked us whether, notwithstanding the expiration of the specific authorizations of appropriations, the SSA's appropriation for administra-

tive expenses remains available to fund these grant programs. *See* Letter for Virginia A. Seitz, Assistant Attorney General, Office of Legal Counsel, from David F. Black, General Counsel, SSA, *Re: (B-323433) Availability of Appropriations for Social Security Administration's Work Incentives Planning and Assistance Program (WIPA) and Protection and Advocacy for Beneficiaries of Social Security Program (PABSS)* (Sept. 28, 2012). We conclude that it does. When an agency has legal authority to administer a program and appropriated funds are available for that purpose, the absence or expiration of an authorization of appropriations does not prevent the agency from expending funds on the program unless such a restriction is imposed by statute.

## I.

### A.

In 1999, Congress found that "financial disincentives to work and earn income and lack of adequate employment training and placement services" were barriers to employment for disabled Social Security beneficiaries. Ticket to Work and Work Incentives Improvement Act of 1999, Pub. L. No. 106-170, § 2(a)(9), 113 Stat. 1860, 1863 ("Ticket to Work Act"). It passed the Ticket to Work Act to help beneficiaries overcome these barriers and enter the workforce. *See id.* § 2(b)(1), (4) (listing among the purposes of the Act "[t]o provide . . . employment preparation and placement services to individuals with disabilities that will enable those individuals to reduce their dependency on cash benefit programs" and "[t]o establish a return to work ticket program that will allow individuals with disabilities to seek the services necessary to obtain and retain employment and reduce their dependency on cash benefit programs").

Among other changes, Congress amended the Social Security Act to create authority for two new grant programs to be administered by the SSA. These programs are now known as WIPA and PABSS. WIPA is a mandatory program established under section 1149, which provides that "[t]he Commissioner [of Social Security] . . . shall establish a community-based work incentives planning and assistance program for the purpose of disseminating accurate information to disabled beneficiaries on work incentives programs and issues related to such programs." 42

U.S.C. § 1320b-20(a)(1). As part of this program, the Commissioner is further required to "establish a competitive program of grants, cooperative agreements, or contracts to provide benefits planning and assistance, including information on the availability of protection and advocacy services, to disabled beneficiaries." *Id.* § 1320b-20(a)(2)(A). Unlike WIPA, PABSS is a discretionary program: section 1150 provides that "the Commissioner may make payments in each State to the protection and advocacy system . . . for the purpose of providing services to disabled beneficiaries." *Id.* § 1320b-21(a). Such services may include "information and advice about obtaining vocational rehabilitation and employment services" and "advocacy or other services that a disabled beneficiary may need to secure, maintain, or regain gainful employment." *Id.* § 1320b-21(b).

Parallel provisions in sections 1149 and 1150 address the sources of funding for these programs. These provisions direct that the costs of WIPA and payments under PABSS "shall be [drawn] from amounts made available for the administration of subchapter II of this chapter [i.e., title II of the Social Security Act] and amounts made available for the administration of subchapter XVI of this chapter [i.e., title XVI]." *Id.* §§ 1320b-20(b)(4)(A), 1320b-21(f)(1). As the Comptroller General has explained, "SSA receives its operating appropriations in the form of an annual lump-sum 'Limitation on Administrative Expenses' (LAE), SSA's equivalent of a 'Salaries and Expenses' appropriation." *Refreshments at Award Ceremony*, 65 Comp. Gen. 738, 739 (1986). Through the LAE, "Congress prescribes . . . the total amount in all the trust funds that is available during the fiscal year for the purpose of administering various SSA programs." *District of Columbia's Reporting and Recording Obligations for Disability Determination Services*, 60 Comp. Gen. 452, 453 (1981).

The LAE typically provides that "[f]or necessary expenses, . . . not more than [a specified amount] may be expended, as authorized by section 201(g)(1) of the Social Security Act, from any one or all of the trust funds referred to" in that section. *See, e.g.*, Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, div. F, tit. IV, 125 Stat. 786, 1108 (2011) ("2012 LAE"); Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, div. D, tit. IV, 123 Stat. 3034, 3277–78 (2009); Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2006, Pub. L. No. 109-149, tit. IV, 119

Stat. 2833, 2877 (2005); Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, app. D, tit. IV, 113 Stat. 1501, 1501A-271 (1999).[1] Section 201(g)(1), in sum,

> authorized to be made available for expenditure, out of any or all of the Trust Funds, such amounts as the Congress may deem appropriate to pay the costs of the part of the administration of this subchapter [i.e., title II of the Social Security Act] . . . [and] subchapter XVI of this chapter [i.e., title XVI] . . . for which the Commissioner of Social Security is responsible.

42 U.S.C. § 401(g). The incorporation of section 201(g) in the LAE makes funds covered by that appropriation available for the administration of titles II and XVI. The funding provisions in sections 1149 and 1150 therefore direct that WIPA and PABSS be funded out of the LAE. *See* GAO Opinion at 2.

In addition to directing the SSA to draw funds for the programs from the appropriation authorized by section 201(g), sections 1149 and 1150 include specific authorizations of appropriations. 42 U.S.C. §§ 1320b-20(e), 1320b-21(h).[2] When Congress first passed the Ticket to Work

---

[1] On September 28, 2012, Congress passed a joint resolution making continuing appropriations for fiscal year 2013. Continuing Appropriations Resolution, 2013, Pub. L. No. 112-175, 126 Stat. 1313 (2012). This continuing resolution ("CR") provided funding "at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2012 and under the authority and conditions provided in such Acts, for continuing projects or activities . . . that are not otherwise specifically provided for in [the CR], that were conducted in fiscal year 2012, and for which appropriations, funds, or other authority were made available" in these acts. *Id.* § 101(a). One of the applicable appropriations acts contained the 2012 LAE. *Id.* § 101(a)(8). Because the CR continued the 2012 LAE, our analysis applies equally to funds available under the CR. For the sake of clarity, we will refer throughout this opinion to the 2012 LAE, as it was the year in which this issue first arose, and both SSA's and the GAO's analyses address that year's appropriation.

[2] As the Congressional Budget Office ("CBO") has explained, "[t]he term 'authorization' is used to describe two types of laws. One is an 'organic,' or 'enabling' statute, which creates a federal agency, establishes a federal program, prescribes a federal function, or allows a particular federal obligation or expenditure within a program." CBO, *Unauthorized Appropriations and Expiring Authorizations* at 5 (Jan. 2012) ("*Unauthorized Appropriations*"), http://www.cbo.gov/sites/default/files/cbofiles/attachments/01-13-UAEA_Appropriations.pdf. The second is "a specific provision that authorizes the appropriation of funds . . . to carry out the program or function established in the enabling

Act, it authorized appropriations for WIPA ($23,000,000) and PABSS ($7,000,000) for five years, from 2000 to 2004. Pub. L. No. 106-170, §§ 121, 122, 113 Stat. at 1890–91. In 2004, Congress extended these specific authorizations of appropriations for another five years; and in 2009 and 2010, it enacted one-year extensions. WIPA and PABSS Extension Act of 2010, Pub. L. No. 111-280, § 2, 124 Stat. 2903, 2903; WIPA and PABSS Reauthorization Act of 2009, Pub. L. No. 111-63, § 2, 123 Stat. 2001, 2001; Social Security Protection Act of 2004, Pub. L. No. 108-203, § 407, 118 Stat. 493, 527. The most recent extension expired in 2011.

## B.

Faced with the expiration of these specific authorizations of appropriations, the SSA concluded that it could not continue WIPA and PABSS with funds from the 2012 LAE. The SSA read the Comptroller General's decision in *Authority to Continue Domestic Food Programs*, 55 Comp. Gen. 289 (1975) ("*Domestic Food Programs*"), and related guidance from the GAO to instruct that "if an agency's authorization of appropriations for a program expires, the agency can continue the program only if the subsequent appropriation (or continuing resolution) specifically provides for the program, or if congressional intent to continue the program is clear in the appropriation's legislative history." Letter for Julia C. Matta, Assistant General Counsel for Appropriations and Budget, GAO, from David F. Black, General Counsel, SSA, *Re: (B-323433) Availability of Appropriations for Social Security Administration's Work Incentives Planning and Assistance Program (WIPA) and Protection and Advocacy for Beneficiaries of Social Security Program (PABSS)* at 7 (July 27, 2012) ("SSA Opinion"). In this case, the SSA observed, Congress had "deviated from its historic practice of reauthorizing appropriations for the WIPA and PABSS programs," and neither the 2012 LAE nor its legislative history mentioned

---

statute. Such a provision constitutes guidance to the Congress regarding the amount of funding that will be necessary to implement the enabling statute." *Id.*; *see also* 1 Government Accountability Office, *Principles of Federal Appropriations Law* 2-40 (3d ed. 2004) (distinguishing between "'enabling' or 'organic legislation' and 'appropriation authorization' legislation"). For the purposes of this opinion, we, like the CBO and the GAO, use the term authorization in the latter sense, and will usually refer to "authorization of appropriations" for clarity. Some of the sources we draw on, however, may use the term in the former sense.

them. *Id.* at 7–8. Moreover, the SSA thought that the legislative history of the prior reauthorizations was "'particularly clear' that Congress repeatedly contemplated that the . . . programs would lapse without reauthorization of appropriations." *Id.* at 8.[3] Applying to these facts the test it gleaned from *Domestic Food Programs* and GAO guidance, the SSA concluded that the 2012 LAE was not available for WIPA and PABSS. *Id.*

The Commissioner informed the Subcommittee on Social Security of the House Ways and Means Committee that it was operating the programs under grants initiated in fiscal year 2011 and planned to stop the programs when those grants expired. *See* Letter for Sam Johnson, Chairman, Subcommittee on Social Security, Committee on Ways and Means, House of Representatives, from Michael J. Astrue, Commissioner, SSA (Mar. 9, 2012); *see also Work Incentives in Social Security Disability Programs: J. Hearing Before the Subcomm. on Soc. Sec. & Subcomm. on Human Resources of the H. Comm. on Ways & Means*, 112th Cong. 10, 19 (2011) (statement of Robert W. Williams, Associate Comm'r, SSA) ("Unless we receive reauthorization, the money for the WIPA and PABSS programs will effectively run out on June 30, 2012 and September 29, 2012, respectively."). The Chairman of the Subcommittee sought the legal opinion of the GAO.

The GAO responded with an opinion dated August 14, 2012, concluding that SSA could, in fact, continue WIPA and PABSS using the 2012 LAE. *See* GAO Opinion. The GAO first noted that "although the authorizations of appropriations have expired, [the] SSA has enabling legislation, that has not expired, and it has an appropriation legally available to cover program costs." *Id.* at 5. Next, because "there is no general requirement that an authorization of appropriations precede an appropriation," the GAO "d[id] not read the absence of an authorization of appropriations to defeat clearly established program authorities set out in the enabling legislation." *Id.* In sum, "[b]ecause the program authority in the enabling

---

[3] As an example, the SSA noted that the Senate managers of the bill that included the first reauthorization of appropriations had explained that the provision "extend[ing] the authorization to appropriate funding for these programs" was needed because the "SSA cannot continue to fund the BPAO [now WIPA] and PABSS programs beyond fiscal year 2004 without an extension of authorization." 149 Cong. Rec. 32,371 (2003). The other evidence cited by the SSA consists of similar statements by individual members of Congress regarding the 2009 and 2010 extensions. *See* SSA Opinion at 3–4.

statutes ha[d] not expired, and [the] SSA ha[d] an appropriation that is available to cover the costs of these programs, [the GAO] conclude[d] that [the] SSA ha[d] adequate authority to continue both programs." *Id.* at 6.[4]

The GAO also considered arguments that a contrary conclusion was compelled by the legislative history of the acts that had previously extended the authorizations of appropriations and by the Comptroller General's decision in *Domestic Food Programs*. The previous extensions, it explained, "provided Members [of Congress with] opportunit[ies] to exercise program oversight and to express the need to continue the programs," and their legislative histories must be read in that context. GAO Opinion at 5. Further, legislative history could not "override the existing statutory program authorities and an appropriation legally available to cover program costs." *Id.* With respect to *Domestic Food Programs*, the GAO acknowledged that the Comptroller General had concluded that "the specific inclusion of the School Breakfast Program in a continuing resolution provided sufficient authority for the Department of Agriculture to continue the program despite the expiration of the authorization of appropriations." *Id.* But the GAO explained that the earlier decision "did not establish a requirement . . . that only a specific program reference in an appropriation act would override the expiration of an authorization of appropriation." *Id.* at 5–6.

## II.

### A.

We begin with several well-established principles. First, "[i]t is axiomatic that an agency must have legal authority to perform its functions and, if it is to spend public monies, appropriated funds." *Funding for the*

---

[4] This conclusion appears to be consistent with the views of the CBO, another office in the Legislative Branch. The CBO is required by statute to provide a report to Congress every January detailing "[a]ll programs and activities funded for the current fiscal year for which authorizations of appropriations have expired." CBO, *Unauthorized Appropriations* at 5 (citing section 203(e) of the Congressional Budget and Impoundment Control Act of 1974). In its most recent report, the CBO "lists the programs and activities funded by an appropriation for fiscal year 2012 whose authorization of appropriations has expired." *Id.* at 7. That list includes both WIPA and PABSS, *id.* app. A, at 53, suggesting that the CBO viewed the SSA's 2012 appropriation as available to fund the programs during that fiscal year.

*Critical Technologies Institute*, 16 Op. O.L.C. 77, 79 (1992). An agency's legal authority "typically derives from its 'organic' or 'enabling' statute," and its appropriated funds "must have been drawn from the Treasury pursuant to a duly enacted statute in accordance with Article I, Section 9 of the Constitution, which provides that '[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by law.'" *Id.* (quoting U.S. Const. art. I, § 9, cl. 7); *see also* Memorandum for General Brent Scowcroft, Assistant to the President for National Security Affairs, from J. Michael Luttig, Assistant Attorney General, Office of Legal Counsel, *Re: Expenditure of Appropriated Funds in the Absence of the Intelligence Authorization Act for FY 1991* at 3 (Nov. 16, 1990) ("Luttig Opinion") ("As a general matter, . . . the legal power to perform governmental functions and an appropriation from Congress are each a necessary condition, and together are a sufficient condition, for lawful spending.").

Second, "[a] lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan* ("*UAW*"), 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.); *see also Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("The allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion."). Hence our repeated advice that, "if the activity or function is one which Congress has elsewhere given the agency authority to perform, its funding does not depend upon its being singled out for specific mention each year in the appropriation process." *Funding for the Critical Technologies Institute*, 16 Op. O.L.C. at 80 (internal quotation marks and brackets omitted).

Third, an agency with sufficient legal authority in its enabling legislation generally is "legally authorized to expend funds in accordance with the appropriation Act even if an authorization bill is not enacted," but it may not do so if Congress has imposed restrictions on the agency's spending authority "in the appropriation Act itself or in some other law." Memorandum for Patricia M. Wald, Assistant Attorney General, Office of Legislative Affairs, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Effect of Lack of an Act Authorizing Appropriations* at 1 (Sept. 12, 1978) ("Harmon

Opinion"); *see also* Luttig Opinion at 2–3.[5] While there is "no constitutional requirement that an appropriation Act must be preceded by an Act authorizing sums to be appropriated," this Office has recognized that "Congress could act by statute to require that appropriations not be spent by Executive agencies in the absence of authorization." Harmon Opinion at 2–3; *see also* 1 Government Accountability Office, *Principles of Federal Appropriations Law* 2-41 (3d ed. 2004) ("*Federal Appropriations Law*") ("There is no general requirement, either constitutional or statutory, that an appropriation act be preceded by a specific authorization act."). Such "an express statutory authorization requirement," Luttig Opinion at 4, might limit an agency's ability to spend appropriated funds, but the precise language of the relevant statute must be carefully examined to determine whether it restricts spending in the absence of an authorization of appropriations. *See, e.g.*, *id.* at 21–24 (suggesting that one such provision was intended "to enforce specific funding allocations in annual authorization acts" and did not itself "require an annual authorization for the lawful expenditure of appropriated funds"); Harmon Opinion at 6 (concluding that "the statute was to be determinative whether sums were authorized for Department appropriations, but was to impose no legal duties or responsibilities on its own"); *see also Nat'l Ctr. for Mfg. Scis. v. Dep't of Def.*, 199 F.3d 507, 510 (D.C. Cir. 2000) ("Because 10 U.S.C. § 114(a)(2) requires authorization of these funds before they become available [for obligation], appropriation alone is insufficient.").

Applying these principles here, we conclude that the 2012 LAE was available to the SSA to fund WIPA and PABSS. First, the SSA has both legal authority and appropriated funds for both programs. Sections 1149 and 1150 of the Social Security Act expressly authorize (and section 1149 requires) the Commissioner to establish programs along the lines of WIPA and PABSS. And Congress provided the SSA with "operating

---

[5] "Authorization legislation is not ordinarily essential for the lawful obligation or expenditure of appropriated funds and, in practice, some agencies operate without budget authorization legislation." Luttig Opinion at 3. Indeed, the CBO reported last year that "[s]everal large agencies or programs ha[d] expired authorizations, including the National Institutes of Health (with appropriations of $31 billion for 2012), the Coast Guard (with appropriations of $10 billion for 2012) and the Community Development Block Grant program (with appropriations of $3 billion for 2012)." CBO, *Unauthorized Appropriations* at 7.

appropriations" in the 2012 LAE. Second, the lump-sum nature of the 2012 LAE provided the SSA with discretion to allocate the provided funds "among . . . permissible objects." *UAW*, 746 F.2d at 861. The only restriction in the text of the appropriation was that the funds be spent on the administration of certain titles of the Social Security Act, including titles II and XVI. Because sections 1149 and 1150 expressly require that programs established thereunder be paid for out of funds dedicated to the administration of titles II and XVI, these programs are "permissible objects" for the lump-sum appropriation. Third, we are aware of no statute that would forbid the expenditure of otherwise available appropriated funds on WIPA and PABSS without specific authorizations of appropriations. Because there is no such prohibition, and because the SSA has statutory authority to administer the programs and appropriated funds are available for them, we conclude that the SSA was legally authorized to continue WIPA and PABSS using the 2012 LAE appropriation.

## B.

This is, concededly, not a case in which Congress has granted an agency authority to carry out a program in its organic act and then simply appropriated funds for that program without ever enacting legislation expressly authorizing those appropriations. Here, Congress included specific authorizations of appropriations for WIPA and PABSS in the Ticket to Work Act, extended those authorizations several times, and then permitted them to expire. The question therefore arises whether this sequence of events—the enactment and expiration of legislation authorizing appropriations for particular programs—somehow changes the application of the general rules described in Part II.A above. Our view is that the guiding principles set out in Part II.A govern whether an authorization of appropriations has expired (as here) or never existed at all.

Authorizations of appropriations, in and of themselves, are primarily of importance to Congress. Congressional rules prohibit appropriations not previously authorized by law, *see* House Rule XXI(2), Rules of the House of Representatives, H.R. Res. 5, 113th Cong. (2013); Senate Rule XVI(1), Standing Rules of the Senate, in Senate Manual, S. Doc. No. 112-1, at 14 (2011), and the responsibilities for authorization and appropriation are

assigned to different committees. Authorizing, or legislative, committees are "charged with making substantive policy as well as recommending spending levels to fund programs in their jurisdiction," while appropriation committees are "responsible for determining how much money will be allocated to those programs." Robert A. Katzmann, *Statutes*, 87 N.Y.U. L. Rev. 637, 649–50 (2012); *see also* 1 *Federal Appropriations Law* at 2-40 to 2-41 ("Like the organic legislation, authorization legislation is considered and reported by the committees with legislative jurisdiction over the particular subject matter, whereas the appropriation bills are exclusively within the jurisdiction of the appropriations committees"). Thus, authorizations of appropriations are "usually internal congressional tools to ensure that the allocation of decisional responsibility among the congressional committees is respected." Luttig Opinion at 3. As then-Assistant Attorney General Scalia explained, "[w]hile th[e] rule is binding as to internal . . . procedure, we find no basis for concluding that it has any legal effect after passage of an appropriation." Memorandum for W. Vincent Rakestraw, Assistant Attorney General, Office of Legislative Affairs, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, *Re: Status of DEA Appropriation Pending Final Action on Authorization Measure* at 2 (Oct. 9, 1974) ("Scalia Opinion"); *see also* Luttig Opinion at 3 n.4 ("[T]he only effect of these rules is internal to Congress: the offending appropriation is subject to a point of order."). We believe it follows that, if an agency has legislative authority to conduct a program and an appropriation available to fund it, it should not matter whether Congress had, at some point in the past, enacted and let lapse an authorization of appropriations that, from the agency's perspective, had never been required. *See* Luttig Opinion at 3 ("An agency's authority to function and spend, which derives from substantive legislation or the Constitution, . . . must be distinguished from authorization legislation through which Congress authorizes itself to appropriate funds. The former, but not the latter, is essential for an agency to lawfully obligate or expend public monies."); *see also* 1 *Federal Appropriations Law* at 2-41 ("An authorization act is basically a directive to Congress itself, which Congress is free to follow or alter (up or down) in the subsequent appropriation act."). Here, as described above, the SSA has authority to conduct the programs, a direction for their funding, and an available appropriation; thus the expiration of the authorizations has no "legal effect" on the SSA's ability to conduct those programs. Scalia Opinion at 2.

In some situations, provisions that authorize appropriations are not solely of relevance to Congress because they also provide an agency with necessary substantive authority to carry out a program. In those circumstances, the agency's authority with respect to the program would be the same whether such an authorization had expired or never existed at all—either way, the agency would have none. "As a general rule, most activities carried out by an agency are permanently authorized by that agency's organic legislation or other statutes that do not have expiration dates." *Continuation of Agency Activities During a Lapse in Both Authorization and Appropriation*, 6 Op. O.L.C. 555, 555 n.1 (1982) ("*Continuation of Agency Activities*"). But if legislative authority "for an agency's activities . . . [is provided] in bills traditionally adopted annually which authorize both specific activities and appropriations for a particular fiscal year, then the authority to engage in those activities expires unless authority to continue them can be derived from other statutes." *Id.*; *see also* Memorandum for the Attorney General from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Legal and Practical Effect of the Lack of an Act Authorizing Appropriations for the Department of Justice* at 1 (Mar. 8, 1982) ("The absence of an authorization act . . . has legal implications to the extent that provisions in an authorization act would authorize expenditure of appropriated funds where no existing authority is in force."). When the provision authorizing appropriations constitutes the exclusive legal authority for the program, the expiration of the provision puts the agency in the same position it was in before the provision was enacted. The agency has no authority, and it is the absence of authority, not the reason for that absence, that matters. In this case, the SSA has permanent legislative authority to carry out WIPA and PABSS. The specific authorizations of appropriations conferred no unique authority on the SSA (to the extent they conferred any authority at all), and their expiration therefore did not result in any diminution of the SSA's authority with respect to the programs. *Cf. Continuation of Agency Activities*, 6 Op. O.L.C. at 555 ("The general rule relating to a lapse in an agency's authorization [i.e., legislative authority] is that activities continue to be authorized, notwithstanding the lapse of a specific authorization, to the extent that they were authorized prior to the enactment of the specific authorization.").

Finally, our opinions support the conclusion that the expiration of an authorization of appropriations has no unique consequence for an agen-

cy's ability to spend appropriated funds on a program for which it has sufficient legal authority. In 1974, this Office was asked if appropriations for the Drug Enforcement Administration ("DEA") could be expended "notwithstanding Congressional inaction on a renewed authorization for this appropriation, the prior authorization for which expired on June 30, 1974." Scalia Opinion at 1. We found no authority to suggest "that the propriety of expenditures of an enacted appropriation is affected in any manner by the fact that the appropriation was not authorized." *Id.* at 2. Nor, of special relevance here, "d[id] we find it legally significant that DEA appropriations had previously been authorized." *Id.* We concluded instead that "the DEA appropriation, once enacted, can be expended, notwithstanding the absence of an authorization for that appropriation." *Id.*

More recently, we considered "whether the Central Intelligence Agency [("CIA")] and the other agencies that perform intelligence and intelligence-related activities may obligate and expend appropriated funds for these activities, in the absence of the Intelligence Authorization Act" for that year. Luttig Opinion at 1. The question arose, we specifically noted, "because Congress has permitted the CIA's authorization to lapse." *Id.* Our opinion began with an analysis very similar to that laid out in Part II.A: we confirmed that "the CIA has appropriated funds" available and that its "organic legislation and the Constitution . . . provide ample power for the CIA to perform its intelligence duties," and we concluded that "[t]he CIA accordingly may draw upon any available appropriated monies to fund its various intelligence activities, absent an express statutory authorization requirement." *Id.* at 2, 4.[6]

## C.

Our conclusion in this matter is consistent with the views of the GAO.[7] Indeed, that office issued an opinion that not only reached the conclusion

---

[6] We went on to reason that, "on the assumption" that such a requirement did exist for the CIA, it was satisfied by a standing authorization to appropriate funds "necessary and appropriate to carry out" the National Security Act of 1947. Luttig Opinion at 5, 25.

[7] The GAO is part of the Legislative Branch, and the Comptroller General is an officer thereof. *See Bowsher v. Synar*, 478 U.S. 714, 727–32 (1986). While we are not obligated to follow their opinions, *see Prioritizing Programs to Exempt Small Businesses from Competition in Federal Contracts*, 33 Op. O.L.C. 284, 302–03 (2009), we nevertheless

that the 2012 LAE was available to fund WIPA and PABSS, but did so through reasoning quite similar to ours. The GAO found that the "SSA has enabling legislation that has not expired" in section 1149, which "requires [the] SSA to administer a work incentives planning and assistance program," and section 1150, which "authorizes it to administer an employment services program for disabled beneficiaries." GAO Opinion at 5 (punctuation omitted). It also found that the SSA "has an appropriation that is legally available to cover the costs of these programs" because "[t]he enabling statutes for both programs provide that their costs be paid out of [the] SSA's administrative funds, and Congress provided [the] SSA with an LAE appropriation for fiscal year 2012." *Id.* Noting that "there is no general requirement that an authorization of appropriations precede an appropriation," the GAO concluded that the SSA "has adequate authority to continue the two programs at issue." *Id.*

The SSA and the GAO disagree on the question whether this outcome is consistent with earlier decisions of the Comptroller General and related portions of the GAO's treatise on appropriations law. They focus most heavily on the Comptroller General's decision in *Domestic Food Programs*. As an initial matter, we are uncertain that *Domestic Food Programs* is on point. In that case, the Comptroller General set out a rule for determining when "the appropriation of funds for a program whose authorization is due to expire . . . confers the necessary authority to continue the program." 55 Comp. Gen. at 292. In other words, we understand *Domestic Food Programs* to address a situation in which the expiring "authorization" provided not only an instruction to Congress but also the agency's substantive authority to carry out the program. *See supra* Part II.B (discussing situations in which provisions authorizing appropriations also confer substantive authority).[8] Subsequent Comptroller General

---

have repeatedly recognized that "[t]he opinions and legal interpretations of the General Accounting Office and the Comptroller General often provide helpful guidance on appropriations matters and related issues," *State and Local Deputation of Federal Law Enforcement Officers During Stafford Act Deployments*, 36 Op. O.L.C. 77, 89 n.8 (2012) (internal quotation marks omitted).

[8] The three programs at issue in *Domestic Food Programs* were the School Breakfast Program, the Special Food Service Program for Children, and the Special Supplemental Food Program. 55 Comp. Gen. at 290. To take one example, the original authority for the

opinions support this understanding. *See, e.g.*, *In re Railroad Rehabilitation and Improvement Fund*, 65 Comp. Gen. 524, 527 (1986) (explaining that, in *Domestic Food Programs*, "[t]he enabling act for the School Breakfast Program expired on June 30, 1975," but the program could "continue for as long as the continuing resolution was in effect").[9]

Moreover, even if the expiring "authorization" in *Domestic Food Programs* were solely an authorization of appropriations, the situation that the SSA confronts here would be different to the extent that there are applicable appropriations authorizations that have not expired. The specific authorizations of appropriations in sections 1149(d) and 1150(h) have

---

School Breakfast Program was created by section 4(a) of the Child Nutrition Act of 1966, which read:

> There is hereby authorized to be appropriated for the fiscal year ending June 30, 1967, not to exceed $7,500,000; and for the fiscal year ending June 30, 1968, not to exceed $10,000,000, to enable the Secretary to formulate and carry out . . . a pilot program to assist States . . . to initiate, maintain, or expand nonprofit breakfast programs in schools.

Pub. L. No. 89-642, § 4(a), 80 Stat. 885, 886. The statute was amended several times before 1975 to authorize funds for additional years, but because no other provision independently granted the Secretary authority to carry out this program, that authority remained temporary. *Cf.* S. Rep. No. 94-259, at 15 (1975) ("The legal authority for the school breakfast program, the special food service program for children, and the special supplemental food program for women, infants, and children (WIC) is scheduled to expire this year."). Shortly after *Domestic Food Programs* was decided, Congress amended section 4(a) to make the authorization of appropriations, and with it the Secretary's substantive authority, permanent. *See* National School Lunch Act and Child Nutrition Act of 1966 Amendments of 1975, Pub. L. No. 94-105, § 2, 89 Stat. 511, 511 (1975).

[9] In its recent opinion, the GAO distinguished *Lite Industries, Inc.*, 65 Comp. Gen. 318 (1986), another Comptroller General decision relied upon by the SSA, as "not applicable here because that decision involved the expiration of program authority." GAO Opinion at 5 n.7. We also find *Lite Industries* to be distinguishable on that basis. As explained in text, we think *Domestic Food Programs* can be distinguished on the same ground, although the GAO does not do so. *See* GAO Opinion at 5; *see also* 2 *Federal Appropriations Law* at 8-32 (describing *Domestic Food Programs* as involving "the expiration of the appropriation authorization legislation"). As explained above, however, the GAO has concluded that the SSA has both program authority and available appropriations here, and that the expired authorizations of appropriations do not eliminate the SSA's ability to spend to carry out those programs. *See supra* Part I.B (summarizing the GAO Opinion); *see also* GAO Opinion at 6 ("Where an agency has statutory authority or a statutory requirement to carry out a particular activity, the presence or absence of an authorization of appropriations is not determinative.").

lapsed, but section 201(g)(1) continues to authorize Congress to make funds available for "the costs of . . . the administration" of titles II and XVI (among others). And because sections 1149(b)(4) and 1150(f)(1) designate "amounts made available for the administration of [title] II . . . and [title] XVI" as the source of funding for WIPA and PABSS, these programs appear to fall within the scope of the permanent authorization in section 201(g)(1).[10] Prior GAO guidance also suggests that the substantive provisions of sections 1149 and 1150 could provide their own authorization of appropriations. *See* 1 *Federal Appropriations Law* at 2-41 ("The existence of a statute (organic legislation) imposing substantive functions upon an agency that require funding for their performance is itself sufficient authorization for the necessary appropriations."). Either way, it would appear that appropriations for "[b]oth programs are permanently authorized," as Representative Xavier Becerra (one of the co-sponsors of the Ticket to Work Act) declared in 2012. *See* 158 Cong. Rec. E1186 (daily ed. June 29, 2012).[11]

Finally, even assuming that *Domestic Food Programs* applies to situations where only an authorization of appropriations has expired (and

---

[10] Indeed, if WIPA and PABSS were not covered by the authorization of appropriations in section 201(g)(1), it would appear that using any LAE to fund them would violate the terms of the appropriation. *See supra* Part I.A (explaining that the LAE typically provides that funds "may be expended, as authorized by section 201(g)(1) of the Social Security Act").

[11] Construing another provision to permanently authorize appropriations for WIPA and PABSS would not necessarily render the specific authorizations in sections 1149 and 1150 superfluous. The more specific provisions might have served to signal to (i) the appropriations committee how much to adjust the LAE to account for the programs, *see supra* Part II.B (discussing the functions of authorizations of appropriations within Congress), and (ii) the SSA how much of the LAE to spend on them, *cf.* 1 *Federal Appropriations Law* at 2-50 to 2-51 ("Applying the principle that an appropriation must be expended in accordance with the related authorization unless the appropriation act provides otherwise, [the] GAO has concluded that the agency must observe [an] earmark [specified in the authorization]."). The Luttig Opinion appears to address another situation in which Congress enacted both a general permanent authorization and more specific annual authorizations. *Id.* at 2, 5 (noting that the CIA did "not have an annual intelligence authorization bill currently in force" because the most recent one had expired, but concluding that Congress had "authorized the appropriation of funds for those activities [the CIA would undertake in 1991] through the permanent authorization in . . . 50 U.S.C. § 411").

statutory authority for the program remains in place), and that the relevant authorizations of appropriations for WIPA and PABSS have expired, we do not find sufficient "indication of contrary [congressional] intent" to overcome the presumption that the 2012 LAE "confers the necessary authority to continue the program[s]." *Domestic Food Programs*, 55 Comp. Gen. at 292 (explaining that, "in the absence of [such] indication," "the appropriation of funds for a program whose authorization is due to expire during the period of availability of the funds confers the necessary authority to continue the program during that period of availability"). Rather, we view the interplay of the 2012 LAE and pre-existing statutes to reflect congressional intent that the programs continue.

The SSA points to several pieces of legislative history relating to previous extensions of the authorizations of appropriations in which legislators warn that the programs would end if the reauthorizations were not enacted. *See, e.g.*, *supra* note 3. This prior legislative history has limited value in assessing congressional intent with respect to the 2012 LAE. Moreover, more recent evidence suggests that members of Congress did not view an additional extension of the authorizations of appropriations in sections 1149 and 1150 as necessary to continue the programs. For example, when introducing a bill to ensure continuation of WIPA and PABSS, Representative Becerra explained that the prior "legislation . . . to extend SSA's specific authorization to use already-appropriated operating budget funds" was passed "[t]o reinforce and clarify the underlying law" that already "permanently authorized" the programs. 158 Cong. Rec. E1186 (daily ed. June 29, 2012). His proposed bill would have addressed the "problem" of the expiring authorizations of appropriations in sections 1149 and 1150 by removing these provisions altogether. *Id.* Similarly, Representative Sam Johnson, the Chair of the Subcommittee on Social Security of the House Ways and Means Committee, warned in 2009 that "these programs would expire . . . and the funding would end" if the authorizations of appropriations were not extended, 155 Cong. Rec. 19,579 (2009), but then criticized the SSA in 2012 for making a "decision to shut these programs down [that] was both yours alone and wrong." Letter for Michael J. Astrue, Commissioner of Social Security, SSA, from Sam Johnson, Chairman, Subcommittee on Social Security, Committee on Ways and Means, House of Representatives (Aug. 15, 2012).

Regardless, we find the most persuasive evidence of Congress's intent with respect to the LAE in the appropriation itself. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2583 (2012) ("[T]he best evidence of Congress's intent is the statutory text."). The 2012 LAE provided the SSA with authority to "expen[d] [funds] as authorized by section 201(g)(1)" of the Social Security Act. Through this incorporation, as explained above, the 2012 LAE "made available . . . amounts . . . [for] the administration of" parts of the Social Security Act, including titles II and XVI. *See* 42 U.S.C. § 401(g)(l) (authorizing Congress to make such funds available for expenditure). Meanwhile, other sections of the Social Security Act provided the SSA with permanent authority to administer PABSS, a permanent requirement to administer a program such as WIPA, and an instruction that these programs be funded out of "amounts made available for the administration of" titles II and XVI. We view the enactment of an appropriation providing such amounts as a sufficiently "clear indication of the intent of Congress that th[ese] programs continue under the [LAE]," 55 Comp. Gen. at 292, to satisfy the rule of *Domestic Food Programs* and its progeny.[12]

### III.

For the foregoing reasons, we conclude that the 2012 LAE was available to the SSA to fund WIPA and PABSS.

VIRGINIA A. SEITZ
*Assistant Attorney General*
*Office of Legal Counsel*

---

[12] As the SSA observes, the Comptroller General and the GAO have previously explained that evidence of congressional intent to continue a program can be found in a specific program reference in the language of a continuing resolution or in "particularly clear" legislative history. *See* SSA Opinion at 7 (citing *Domestic Food Programs* and 2 *Federal Appropriations Law* at 8-32). We understand those authorities to establish that such conditions are sufficient to satisfy the rule of *Domestic Food Programs*, not that they are necessary to do so. *See* GAO Opinion at 5–6 (rejecting the argument that *Domestic Food Programs* "establish[ed] a requirement . . . that only a specific program reference in an appropriation act would override the expiration of an authorization of appropriation").